183 F.3d 1055 (9th Cir. 1999)
 THE ASSOCIATION OF MEXICANAMERICAN EDUCATORS ("AMAE"); CALIFORNIA ASSOCIATION FOR ASIAN-PACIFIC BILINGUAL EDUCATION ("CAFABE"), ON BEHALF OF THEMSELVES, THEIR MEMBERS, AND ALL OTHERS SIMILARLY SITUATED; OAKLAND ALLIANCE OF BLACK EDUCATORS ("OABE"), ON BEHALF OF THEMSELVES, THEIR MEMBERS, AND ALL OTHERS SIMILARLY SITUATED; SARA MACNEIL BOYD; SAM GENIS; TOUA YANG; BOB WILLIAMS; MARTA LECLAIRE; ANTOINETTE WILLIAMS; DIANA KWAN AND AGNES HAYNES, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTSCROSS-APPELLEES,
v.
STATE OF CALIFORNIA; THE CALIFORNIA COMMISSION ON TEACHER CREDENTIALING, DEFENDANTS-APPELLEESCROSS-APPELLANTS.
 Nos. 96-17131, 97-15422
 U.S. Court of Appeals, Ninth Circuit
 Argued and Submitted November 5, 1997
July 12, 1999
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 John T. Affeldt, Public Advocates, Inc., San Francisco, California, for plaintiffs-appellants-cross-appellees The Association of Mexican-American Educators, et al.
 
 
 3
 Stephanie Wald (briefed), Deputy Attorney General, San Francisco, California, for defendants-appellees-cross appellants The State of California and The California Commission On Teacher Credentialing.
 
 
 4
 R. Lawrence Ashe, Jr., Paul, Hastings, Janofsky & Walker, Atlanta, Georgia, for defendants-appellees-cross-appellants The State of California and The California Commission On Teacher Credentialing.
 
 
 5
 Peter Roos (briefed), Meta, Inc., San Francisco, California, for amicus California Association for Bilingual Education, Educational coalition of Hispanics in Oakland and Chicano Federation of San Diego County, Inc.
 
 
 6
 Paul J. Dostart (briefed), Dostart, Clapp, Sterrett & Coveney, San Diego, California, for amicus California State Pta.
 
 
 7
 Stewart Weinberg (briefed), Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, California, for amicus California Federation of Teachers.
 
 
 8
 Martin Bienstock (briefed), United States Attorney General's Office, New York, New York, for amicus The New York State Education Department, The Alabama State Department, and The States of Oregon and Nevada.
 
 
 9
 John L. Bukey (briefed), West Sacramento, California, for amicus Education Legal Alliance.
 
 
 10
 Appeals from the United States District Court for the Northern District of California. William H. Orrick, District Judge, Presiding. D.C. No. CV 92-03874-WHO
 
 
 11
 Before: Robert Boochever and Andrew J. Kleinfeld, Circuit Judges, and Stephen V. Wilson, District Judge.*
 
 
 12
 Opinion by Judge Wilson; Dissent by Judge Boochever
 
 
 13
 Plaintiff class of minority educators appeals the District Court's finding that the Defendant California Commission on Teacher Credentialing's CBEST exam did not violate Title VI or Title VII of the 1964 Civil Rights Act ("Plaintiffs' Appeal"). Defendants cross-appeal the District Court's earlier finding on summary judgment that Title VI and Title VII apply to California's credentialing of public school teachers, and appeal the District Court's denial of their costs ("Defendants' Appeal").
 
 I. Facts and Procedural History[1]
 
 14
 Effective February 1, 1983, the California State Legislature amended the California Education Code to bar the California Commission for Teacher Preparation and Licensing ("CTPL") from issuing any credential, permit, or certificate to any applicant unable to demonstrate basic reading, writing and mathematics skills in the English language as measured by a basic skills proficiency test. Association of Mexican American Educators v. State of California, 836 F. Supp. 1534, 1538 (N.D. Cal. 1993) ("AMAE I"). In May 1983, after three test administrations, the CTPL assumed full responsibility for revising and administering the CBEST.[2]AMAE I, 836 F. Supp. at 1539.
 
 
 15
 The United States has long provided California, through its Board of Education ("Board"), with financial assistance for educational purposes; it is undisputed that the Board has received such federal financial assistance continuously since 1983. AMAE I, 836 F. Supp. at 1537. During that same time period, the California Department of Education ("DOE") has distributed most of that federal money to local school boards. Id.
 
 
 16
 At the same time, however, neither the CPTL nor its successor the CTC have received any federal funds. AMAE I, 836 F. Supp. at 1538. Indeed, the District Court found that in the entire history of California's credentialing authorities, the federal government has provided financial assistance only to one project and that aid for that project ceased in 1979. Id.
 
 
 17
 Proportionately more of the minorities taking the CBEST have failed it, compared to Caucasians. This pattern appeared in the first administration of the test and has persisted. The Plaintiff class of minority educators brought suit to enjoin the use of the CBEST, alleging that it has a disproportionate adverse impact on racial minorities, that the Defendants failed to properly validate the test, and that the Defendants failed to adopt equally effective screening procedures with a lesser adverse impact.
 
 
 18
 In 1993, the District Court ruled on summary judgment that both Title VI and Title VII applied to the Commission's use of the CBEST as an employment screening device. Association of Mexican-American Educators v. State of California, 836 F. Supp. 1543 (N.D. Cal. 1993) ("AMAE I"). Following a bench trial, in 1996 the District Court held 1) that Plaintiffs had established a prima facie case by showing that the CBEST has a disparate impact on minorities; 2) that all three studies of the CBEST submitted to the court proved it to be a valid measure of job-related skills; 3) that the passing score reflected professionally reasonably judgments about minimum skill levels of basic knowledge, skills and abilities for teaching jobs; and 4) that Plaintiffs had failed to show the existence of an equally effective alternate screening device. Association of Mexican-American Educators v. State of California, 937 F. Supp. 1397 (N.D. Cal. 1996) ("AMAE II"). The District Court subsequently denied the Defendants' costs in an Order filed on February 12, 1997 ("Order").
 
 
 19
 On appeal, Plaintiffs contend that the District Court erred in holding that the CBEST was properly validated, and that the court violated Federal Rule of Evidence 706 by relying upon the advice of an expert witness who was not subject to cross-examination and did not prepare an expert's report. The Defendants contend that the District Court erred in holding that Title VI and Title VII apply to its administration of the CBEST, and that it abused its discretion when it denied their costs of $216,443.67.
 
 
 20
 We review de novo the district court's summary judgment ruling that Title VI and Title VII apply to the Commission's testing activities and review the District Court's factual findings for clear error. Under those standards, we conclude that Title VI and Title VII do not apply to the Commission's administration of the CBEST and we therefore grant Defendants' Appeal. As an alternative ground for upholding the District Court's judgment, we find that the District Court's factual findings were not clearly in error and we therefore deny Plaintiffs' Appeal. However, because we conclude that a court may only deny a prevailing party all costs when the party has engaged in misconduct, we remand the case to the District Court to reconsider Defendants' application for costs.
 
 II. Legal Analysis
 A. Standard of Review
 
 21
 We review de novo the District Court's Conclusion of law that Title VI and Title VII apply to the Commission's testing activities, Bagdai v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and review the District Court's factual findings for clear error. Clady v. County of Los Angeles, 770 F.2d 1421, 1427 (9th Cir. 1985).
 
 B. Application of Title VI to the CBEST
 1. General Applicability of Title VI
 
 22
 Title VI was originally passed as part of the 1964 Civil Rights Act, and it contains a prohibition on the use of federal dollars to subsidize racial discrimination:
 
 
 23
 "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, or be denied the benefits of, or be subject to discrimination in any program or activity receiving Federal financial assistance."
 
 
 24
 42 U.S.C.A. S 2000d.
 
 
 25
 The purpose of Title VI is clear: Congress wanted to avoid the use of federal resources to support discriminatory practices and it wanted to provide effective protection against those practices. Cannon v. University of Chicago , 441 U.S. 677, 704 n.36 (1979).
 
 
 26
 In the Civil Rights Restoration Act of 1987, Congress amended Title VI to include a definition of "program or activity." As amended, Title VI provides that:
 
 
 27
 "For the purposes of this subchapter, the terms "program or activity" and the term "program " mean all of the operations of
 
 
 28
 (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
 
 
 29
 (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government; or
 
 
 30
 (2)(A) a college, university, or other post-secondary institution, or a public system of higher education; or
 
 
 31
 (B) a local educational agency (as defined in section 8801 of Title 20), system of vocational education, or other school system; or
 
 
 32
 (3)(A) . . .
 
 
 33
 (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);
 
 
 34
 any part of which is extended Federal financial assistance."
 
 
 35
 42 U.S.C.A. S 2000d-4a.
 
 
 36
 In other words, the definition of "program or activity" provided by Congress means that if any part of a listed entity receives federal funds, the entire entity is covered by Title VI. Grimes v. Superior Home Health Care, 929 F. Supp. 1088, 1092 (M.D. Tenn. 1996).
 
 
 37
 2. Application of Title VI to the CTC: Title VI Does Not Apply to the CTC Simply By Virtue of Its Existence as Part of the "Public School System" in California because the term "School System" Is Used More Expansively By The California State Constitution Than by 42 U.S.C.A. S 2000d-4a(2)(B)
 
 
 38
 The District Court found that neither the CTC nor its predecessor, the CTPL, had received federal funds after January 1, 1980. AMAE I, 836 F. Supp. at 1538. The District Court went on to observe that -- although not a direct recipient of federal funds -- the CTC could nevertheless be liable under Title VI if it was a part of a school system and any part of that system received federal funds. Id. at 1544 (citing 42 U.S.C.A. S 2000d-4a(2)(B)). Reviewing the structure of public education in California, the District Court held that public education in California was, in fact, a single school system and that as a State agency concerned with education, the CTC was a part of that single school system. Id. at 1544-45. Since public education in California receives federal funds, the District Court held that CTC was therefore "part of a `school system' referred to in subsection (2)(B)" of S 2000d-4a. Id. at 1544.
 
 
 39
 In concluding that public education in California is part of a single school system, the District Court placed particular emphasis on a provision from the California State Constitution, which refers to public education in California as "the Public School System." AMAE I, 836 F. Supp. at 1544 (citing Cal. Const., art. IX, S 6, P 2[3]). Although the Defendants below apparently argued that the CTC was outside of the "Public School System," the District Court rejected the argument. Looking both to the Constitutional provision itself and to the state decisions interpreting that provision, the District Court concluded that the California State Constitution establishes an "entire, unified school system" and that such a system included regulatory bodies like the CTC and the Board of Education. AMAE I, 836 at 1544 (citing Kennedy v. Miller, 97 Cal. 429, 432 (1983) and California Teachers Ass'n v. Board of Trustees, 82 Cal. App. 3d 249, 253-54 (1978)).
 
 
 40
 We do not disagree with the District Court's Conclusion that the CTC falls within the "Public School System" established by the California Constitution. We do, however, disagree with a critical assumption apparently made by the parties. We do not assume that the "Public School System" defined by the California Constitution necessarily qualifies as the sort of "school system" to which Congress referred in S 2000d-4a(2)(B). In other words, we do not assume that the term "school system" is used in the same manner by Congress and the California State Constitution. As a result, we must determine whether the whole edifice of public education in the State of California would qualify under the federal definition of "school system" embodied in S 2000d-4a(2)(B).
 
 
 41
 To begin, we must determine the appropriate definition of "school system" as used in subsection (2)(B) of S 2000d-4a. For this purpose, we start with the language of the statute. As quoted above, S 2000d-4a(2)(B) applies to the operations of:
 
 
 42
 "a local educational agency (as defined in section 8801 of Title 20), system of vocational education, or other school system."
 
 
 43
 42 U.S.C.A. S 2000d-4a(2)(B).
 
 
 44
 Of the three terms included in subsection (2)(B),"local educational agency" is both the only defined term and the only term to which any substantial jurisprudence has attached.[4] To understand the meaning of subsection (2)(B), then, we naturally begin by looking to the definition and history of the term "local educational agency." Pursuant to Section 8801 of Title 20, that term is defined as:
 
 
 45
 "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools.
 
 
 46
 The term includes any other public institution or agency having administrative control and direction of a public elementary or secondary school." 20 U.S.C.A. S 8801(18)(A-B).
 
 
 47
 We also observe that 20 U.S.C.A. S 8801 contains a definition for a "State educational agency," which it describes as "the agency primarily responsible for the State supervision of public elementary and secondary schools."
 
 20 U.S.C.A. S 8801 (28).[5]
 
 48
 The distinction between "local educational agency " and "State educational agency" is important in this case. It is true that the definition of "local educational agency, " read broadly, could include any agency that had any regulatory control over a public school. However, such an expansive reading would ignore the fact that Congress has drawn a distinction between the State educational agencies that regulate schools and the local educational agencies that administer those schools. Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist., 714 F.2d 946, 951 (9th Cir. 1983) (observing that an "educational agency" is either a "local educational agency" or a "State educational agency"); United States v. City of Yonkers, 96 F.3d 600, 619 (2d Cir. 1996) (same). This distinction is well established in the structure of numerous federal educational statutes that place different requirements on State educational agencies and local educational agencies. See e.g., 20 U.S.C.A. S 1414(a) (providing for local educational agencies to submit applications to State educational agencies under Education of the Handicapped Act); 20 U.S.C.A. S 1103c (same for Teacher Corps); 20 U.S.C.A. S 1415(c) (providing for review by State educational agency of decisions by local educational agency); Beard v. Teska, 31 F.3d 942, 954 (10th Cir. 1994) (distinguishing between "local educational agencies" and "State educational agencies"). After reviewing the statutory roles of State educational agencies and local educational agencies and the case law relating to those roles, it is apparent that "local educational agencies" are those which actually administer the local schools.
 
 
 49
 In determining what constitutes an agency which actually administers the local schools, the Court is required to look to state law and practice to determine what entity is "recognized in a State as an administrative agency for its public elementary or secondary schools." 20 U.S.C.A. S 8801(18)(A-B). In this case, notwithstanding the State Constitutional provision that public education is a part of "the Public School System," we find that public schools in the State of California are administered by school districts.[6] Such school districts are responsible for the receipt and payment of bills and debts, and maintain their own accounting and payroll procedures. School districts purchase their own supplies, equipment, and transportation units. They separately negotiate employment agreements and separately hire, pay, and oversee the employees who teach and administer California's public schools. School districts not only manage the schools on a daily basis, they also plan and execute the acquisition, management, and disposal of facilities. They are responsible for the safety and security conditions in their schools. In short, the school districts -- and not the entire edifice of public education in California -- constitute the primary agencies which manage schools within the meaning of "local educational agency" as used in 20 U.S.C.A. S 8801(18).
 
 
 50
 Of course, neither the parties nor the District Court have asserted that the California "Public School System" is a "local educational agency" within the meaning of S 8801 and it might seem obvious that it is not.[7] Nevertheless, we think this Discussion is important because we think that it sheds light on the proper interpretation of S 2000d-4a(2)(B).
 
 
 51
 Looking at the structure of S 2000d-4a(2)(B), it appears to us that Congress meant to expand "program or activity" to all activities within administrative units like school districts. Aside from the catch-all phrase, to which we will turn momentarily, S 2000d-4a(2)(B) speaks only of "local educational agencies" and "systems of vocational education."[8] We have just discussed the limitations inherent in "local educational agency" and we think that the same limitation is obviously inherent in "system of vocational education." By a "system of vocational education" Congress meant any set of vocational schools or programs that were administered by a central body, with management over supplies, facilities, and personnel. It is naturally possible (particularly in a smaller state) that a system of vocational education could be a statewide system, but such a system would still be a discrete system whose management characteristics are similar to school districts.
 
 
 52
 We think that the catch-all term "other school system" cannot be interpreted independently, but must be interpreted in the context of the previous two terms. In determining whether something qualifies as an "other school system " within the meaning of S 2000d-4a(2)(B), we do not simply ask whether it calls itself a "school system." Labels alone are frequently misleading.[9] Instead, we must ask whether its essential characteristics are similar enough to those school systems addressed above that we would consider them a single unit for practical purposes. For example, an educational authority which focused upon adult education might not call itself a "school system" but might nevertheless operate with the sort of centralized management akin to a school district. By contrast, a loosely-affiliated group of private schools might refer to themselves as a "school system" for the purpose of creating a sports league, but we would think it clear that this alone, without more, would not subject every facet of every school in the league to Title VI if one school alone received Federal funds. Indeed, the Supreme Court has very recently made clear that not even the league itself is subject to Title VI merely because one member of the league received federal funds. National Collegiate Athletic Association v. Smith, 119 S.Ct. 924, 926 (1999). The critical issue is whether the schools are managed in relevant respects as a connected unit.
 
 
 53
 The legislative history of S 2000d-4a(2)(B) supports this Conclusion. The Congressional Report on the Civil Rights Restoration Act of 1987 cautions that "[f]or two or more schools to be considered a `school system', there must be some significant linkage between them. Thus, for example, any group of schools whose only connection to each other is that they belong to some umbrella advocacy or membership group, or that they are accredited by one central accrediting agency, would not constitute a school system." S. Rep. No. 100-64 at 17 (1987), reprinted in 1988 U.S.C.C.A.N. 3, 19 (emphasis added).[10]
 
 
 54
 A second comment from the Report deserves attention here. The Report states that "[i]f federal financial assistance is extended to one of three secondary schoolswhich comprise a system operated by a Catholic Diocese, all of the operations within all three of the schools in the system are covered." Id. This follows naturally from the fact that such a system would be similar to a school district. We observe, however, that while Title VI coverage would be extended to the entire school system within that Diocese (which is traditionally a metropolitan area), such coverage would not be extended to all schools in the country under the auspices of the Catholic church, nor even all schools under the auspices of a particular Catholic Metropolitan (the Catholic organizational unit that is territorially equivalent to a State). From this we conclude that Title VI extends to all activities within a school district or its equivalent, regardless of whether the system calls itself a "school system" or not.
 
 
 55
 In the present case, we find that the State Constitutional requirement of a single "Public School System " in California does not mean that public education in California is a "school system" within the meaning of S 2000d-4a(2)(B). Although California requires that all of its public schools be chartered under State authority, Kennedy v. Miller, 97 Cal. 429, 436 (1893), the fact that they all derive from State power is not enough to make all such schools and school districts together a single "system" in the sense required for Title VI coverage. Cf. Gonzales v. State, 29 Cal. App. 3d 585, 590 (1972) (holding that while school districts exercise state power, they are each independent entities). As a consequence, we conclude that CTC is not covered by Title VI solely by virtue of its existence as part of the "Public School System " of the State of California.
 
 
 56
 3. Application of Title VI to the CTC: Title VI Does Not Apply to the CTC Simply by Virtue of Its Existence as Part of the State of California because Receipt of Federal Funds by One State Entity Does Not Automatically Subject the Entire State Government to Coverage.
 
 
 57
 Because the District Court found that S 2000d-4a(2)(B) resulted in coverage of the CTC under Title VI, the District Court declined to consider whether the CTC was covered under subsection (4) of S 2000d-4a. AMAE I , 836 F. Supp. at 1545 n.8. As we have reached the opposite Conclusion, we must proceed to consider whether S 2000d-4a(4) applies to the CTC.
 
 
 58
 As quoted above, S 2000d-4a(4) extends the definition of program or activity to "any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3)." 42 U.S.C.A. S 2000d-4a(4). In essence, Plaintiffs allege that the State of California is subject to Title VI as a recipient of federal funds and that the CTC is covered under Title VI because the CTC is established by the State of California.
 
 
 59
 We disagree. Because the State itself cannot be considered a "program or activity" under S 2000d-4(a), only subsections of the State and not the State as a whole can be subject to Title VI.[11] The CTC was not established by any subsection of the State subject to Title VI,[12] and consequently the CTC is not covered under S 2000d-4a(4).
 
 
 60
 As laid out above, S 2000d-4a(1) extends the definition of "program or activity" to all of the operations of "a department, agency, special purpose district, or other instrumentality of a State or local government" and to all of the operations of "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended." 42 U.S.C.A. S 2000d-4a(1)(A &B). In other words, S 2000d-4a(1) applies to any department or agency of the State which has received federal funds, whether the State entity receives such funds directly from the government or via another State entity.
 
 
 61
 At the same time, however, nothing in S 2000d-4a would include the State, as such, in the enumeration of entities listed in the definition of "program or activity." This omission cannot be accidental. Although we could begin with the interpretive cannon, expressio unius, the structure of the statute is direct and conclusive proof that Congress did not mean to subject an entire State to Title VI. Congress went to great lengths in subsection (1)(B) to detail the fact that each department or agency of a State which received federal funds would be subject to Title VI, even if they received such funds via another agency. Subsection (1)(B) would be superfluous if receipt by one agency of the State subjected the entire State to Title VI, and we strive to avoid any construction that would render some of the statute superfluous. Burrey v. Pacific Gas and Elec. Co., 159 F.3d 388, 393 (9th Cir. 1998). Congress simply could not have meant to extend Title VI to the entire State government because one department or agency received aid (even aid intended for the State).
 
 
 62
 Again, the legislative history supports our Conclusion. The Congressional Report explicitly concluded that "[f]or State and local governments, only the department or agency which receives the aid is covered." S. Rep. 100-64 (1987), reprinted in 1988 U.S.C.C.A.N. 3, 6. Although this is an issue of first impression in our Circuit, other Circuits interpreting the Civil Rights Restoration Act have also come to this Conclusion. Schroeder v. City of Chicago, 927 F. 2d 957, 961 (7th Cir. 1991); Lightbourn v. County of El Paso, Texas , 118 F.3d 421, 427 (5th Cir. 1997). In sum, we hold that while Title VI may apply to any subsection of the State which receives federal funds, Title VI will not apply to the State as a whole simply because one subsection receives such funds.
 
 
 63
 The District Court found that "the United States has long provided the State, through its Board of Education, financial assistance for use in education." AMAE I, 836 F. Supp. at 1537. The District Court also found that "the California Department of Education ("DOE") has distributed most of that money to local school boards." Id. These findings indicate that the California Board of Education, the Department of Education, and the local school boards are all subject to Title VI under S 2000d-4a(1)(A)&(B). However, although the money may have been given to the Board of Education on behalf of the State, it is that agency and not the State as a whole which is covered by Title VI as a result.
 
 
 64
 The CTC was not created by the Board of Education, the Department of Education, or the local school boards. As a result, although such agencies are covered by Title VI, the CTC is not covered by virtue of S 2000d-4a(4).
 
 
 65
 In sum, we conclude that the Plaintiffs have not demonstrated that the CTC is covered by Title VI and we order the District Court to dismiss Plaintiffs' Title VI claim against the CTC.
 
 
 66
 4. Application of Title VI to California's Statutory Requirement that Prospective Teachers Pass the CBEST: As Neither the Legislature Nor the CTC Receives Federal Funding, Title VI Does Not Attach to the State's Requirement For Teacher Certification
 
 
 67
 Our Conclusion in the previous section that the State of California is not automatically subject to Title VI compels the Conclusion that the State of California is not liable under Title VI for imposing the CBEST as a statutory requirement for a public teacher's credential. The receipt of federal funds by the California Board of Education subjects the Board to Title VI, but it does not extend the coverage of Title VI into all of the operations of the entire State. Likewise, the receipt of federal funds by the California Department of Education subjects that Department to Title VI, but it does not extend coverage of Title VI into all operations of the entire State. In this case, the statutory requirement was imposed by the California Legislature. It is clear that Title VI coverage does not attach directly to the requirement as imposed by the Legislature.
 
 
 68
 As we have found that the CTC is not a covered program or activity, and as there is no evidence that the Legislature is a covered program or activity, no Title VI liability could possibly result from their actions.
 
 
 69
 C. Application of Title VII to the State Requirement that School Districts May Only Employ Credentialed Individuals
 
 
 70
 1. Title VII Applies to Relationships Between Government Employers and Government Employees
 
 
 71
 Title VII was also originally passed as part of the 1964 Civil Rights Act, and Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A.S 2000e2(a)(1). It is well established that Title VII applies "to governmental and private employers alike." Dothard v. Rawlinson, 433 U.S. 321, 332 n. 14 (1977); Blake v. City of Los Angeles, 595 F.2d 1367, 1372 (9th Cir. 1979).
 
 
 72
 2. Title VII Does Not Apply to the State's Requirement of the CBEST for Potential Teachers Because the CBEST is a Licensing Exam
 
 
 73
 Defendants argued below that the CBEST was part of the State's licensing process for public school teachers, relying upon the fact that Title VII does not apply to governmental licensing activities. See Haddock v. Board of Dental Exam'rs, 777 F.2d 462, 464 (9th Cir. 1985) (holding that Title VII did not apply to licensing activities of California's Board of Dental Examiners).
 
 
 74
 Although the District Court agreed that Title VII does not apply to governmental licensing activities, AMAE I, 836 F. Supp. at 1549, the District Court concluded that the CBEST was not a licensing exam because it only licensed public school teachers. Id. The District Court observed that one could be a teacher in a private school without having passed the CBEST, and that the CBEST only stood as a barrier to employment in the State's "own schools. " Id. For that reason, the District Court determined that "the CBEST is an examination that tests an individual's qualification for a job with a particular employer (the State), not an examination that tests minimal competence for the job of teaching. " Id.
 
 
 75
 We agree with the District Court that, if the State requires an exam solely for its own employees, such an exam constitutes an employment exam. We also think it evident that Title VII applies even if the purpose of the exam is to improve the quality of the State's service to the public, because virtually any State employment exam could be cast as an attempt to improve the quality of the State's service to the public.
 
 
 76
 a. The CBEST Is Not an Employment Exam Because the State Is Not the Potential Employer
 
 
 77
 Nevertheless, we do not agree with the characterization of the CBEST as testing for a "particular employer (the State)." We note that, immediately after determining that the CBEST was an employment exam, the District Court then discussed the fact that teachers are not employed by the Defendants. AMAE I, 836 F. Supp. at 1550. The parties and the lower court agree that teachers are "employees " of the various school districts, rather than employees of the State or of the CTC. Id.
 
 
 78
 As such, we cannot agree that the State is the "employer" in this instance. We recognize that school districts in California are instrumentalities of the State, Belanger v. Madera Unified Sch. Dist., 963 F.2d 248, 251-54 (9th Cir. 1992); First Interstate Bank of California v. State of California, 197 Cal. App. 3d 627, 633 (1988), but we view the relationship between school districts and the State as analogous to the parent/subsidiary relationship. It is well established that a parent company will not usually be considered the "employer" under Title VII for the employees of its subsidiary. Watson v. Gulf & Western, 650 F.2d 990, 993 (9th Cir. 1981).[13] It is likewise well-established in California that the school districts, although "exercising a portion of the state's powers of government, are not the state or a part of the state," Gonzales v. State of California, 29 Cal. App. 3d 585, 590 (1972), and that employees of the school districts are not employees of the State. Id. at 590-91, 105 Cal.Rptr. 804 (observing that employee "compensation is fixed by the district and not the state," that the employee "is paid by the district and not the state," that "the scope of his employment is determined by the district and not by the state," that "the right to control and supervise him is vested exclusively in the district by the state without reservation," and that "he may be discharged by the district for cause, and not by the state."); see also Norton Sound Health v. Bearing Strait Sch. Dist., 138 F.3d 1281, 1284 (9th Cir. 1998) (holding that, in applying federal statute, Alaska school districts constitute an "arm of the State" but not the "State" itself). As the State is not itself the potential employer for the Plaintiffs in this case, we do not believe that the CBEST should be characterized as an employment exam.
 
 
 79
 b. The CBEST Is A Valid Licensing Exam Because The CBEST Is Required Under the State's Police Power and Not Its Proprietary Power
 
 
 80
 The question still remains whether the CBEST is a valid licensing exam. The District Court was of course cognizant of the fact that the school districts are the direct employers, and not the State. AMAE I, 836 F. Supp. at 1550. Nevertheless, the District Court found that the CBEST was not a licensing exam because it focused solely on public employees and not private employees. Id. at 1550.
 
 
 81
 We agree with the District Court that the limitation of the examination to public school teachers raises a question as to whether it is a true licensing exam. Nevertheless, we do not think that such a limitation is necessarily dispositive. Although previous federal courts to uphold teacher licensing exams have not discussed the consequences of the fact that such exams were restricted to public employees, see e.g., Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017 (5th Cir. 1990),[14] we think that the critical issue is whether the State is exercising its police powers or its proprietary powers.[15] The clear principle behind the licensing exception is that a State will not be liable under Title VII for "interference" with an employment relationship if the alleged interference is an exercise of its regulatory responsibilities. See e.g., George v. New Jersey Bd. of Veterinary Medical Exam'rs, 794 F.2d 113, 114 (3rd Cir. 1986) (holding that Title VII does not reach licensing under police powers of a state).
 
 
 82
 Although a limitation of an examination to public employees will inevitably raise the question of whether the State is exercising its proprietary power, it does not inherently require such a Conclusion. For example, imagine that the State were to conclude that criminal courts were frequently convicting indigent citizens because their defense attorneys were insufficiently versed in the law of the Fourth Amendment. Furthermore, imagine that the California Legislature were to pass a law addressed to this problem, requiring that all attorneys employed by public defender offices of the various cities or counties in California were required to pass an exam on the Fourth Amendment as a condition of employment.
 
 
 83
 We think that such an exam would be an exercise of the State's police power, and would therefore be a valid licensing exam despite the fact that it was not extended to private criminal defense attorneys. At least two factors would support such a Conclusion. First, we would consider the fact that the requirements extend beyond State employees to all similar professionals in any public agency to be evidence that the State is employing its police power. Second, we would consider the fact that this requirement was mandated by the Legislature (rather than by an administrator responsible for managing the positions at issue) as providing additional evidence that the State is acting in its sovereign capacity rather than its proprietary capacity.
 
 
 84
 Returning to the CBEST exam, we think this is a very close question. Nevertheless, we think that the State is exercising its police powers and not its proprietary powers when it requires that public school teachers be certificated employees. First, although the public schools are instrumentalities of the State under California law, California law establishes that teachers are not State employees. Gonzales v. State of California, 29 Cal. App. 3d 585, 590-91 (1972). Second, the CBEST was mandated by the Legislature and not an administrator or administrative agency responsible for overseeing the employees at issue. Although these factors are not necessarily dispositive, we find in this case that they tip the balance in favor of the Defendants. See generally Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017, 1020 (5th Cir. 1990) (holding that Texas teacher's exam did not make State of Texas into an employer and rejecting claim that the State of Texas was subject to Title VII liability for any effect of exam).
 
 
 85
 The District Court found that the CBEST was not a valid licensing exam, and that as such it constituted an actionable interference with the employment relationship. AMAE I, 836 F. Supp. at 1551 (citing Sibley Mem. Hosp. v. Wilson, 488 F.2d 1338 (D.C. Cir. 1973)). As we conclude that it is a valid licensing exam, and therefore exempt from liability under Title VII, we need not decide whether Sibley would otherwise apply to this situation.[16]
 
 
 86
 In sum, we conclude that Title VII does not apply to either the State of California or the CTC as their actions relate to the licensing of public school teachers in the State of California.
 
 
 87
 D. The District Court's Findings That the Test Was Discriminatory
 
 
 88
 Although our Conclusion that Title VI and Title VII do not apply to the CBEST could resolve the case, we have reviewed the District Court's factual findings in response to Plaintiffs' Appeal and we find no reversible error in those factual findings. As such, we approve the District Court's factual findings as an alternative ground on which we affirm the District Court's judgment.[17]
 
 1. General Requirement of Test Validation
 
 89
 "Discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." Albemarle Paper Co. v. Moody, 422 U.S. 405, 431 (1975). In evaluating tests under Title VII that allegedly have a disparate racial impact, we apply a burden-shifting approach. In the first step of the approach, the plaintiff must establish a prima facie case by demonstrating that the test causes a disparate impact on the basis of race. If the plaintiff makes a prima facie case, the burden shifts to the defendant to demonstrate that the test was properly "validated" to be "job related for the position in question and consistent with business necessity. " 42 U.S.C. S 2000e-2k(1)(A)(i); see also Albemarle Paper, 422 U.S. at 425.[18]
 
 
 90
 The District Court found that Plaintiffs met their burden of proving that the CBEST has a disparate impact on the plaintiff class. AMAE II, 937 F. Supp. 1397, 1403 (N.D. Cal. 1996), and this finding is not challenged on appeal. Proceeding to validation, the District Court found that Defendants had successfully rebutted the prima facie case. The District Court found that the CBEST had been properly validated in three studies: (1) the 1982 Wheeler & Elias study, (2) the 1985 Practitioner's Review, and (3) the 1995 Lundquist study.[19] Plaintiffs is their appeal challenge this finding by the District Court that the CBEST was properly validated.
 
 
 91
 Steps to Validate Employment Criteria: As we have previously explained, the validation of an employment criteria involves a three-step process:
 
 
 92
 "The employer must first specify the particular trait or characteristic which the selection device is being used to identify or measure. The employer must then determine that that particular trait or characteristic is an important element of work behavior. Finally, the employer must demonstrate by "professionally acceptable methods" that the selection device is "predictive of or significantly correlated" with the element of work behavior identified in the second step."
 
 
 93
 Craig v. County of Los Angeles, 626 F.2d 659, 662 (9th Cir. 1980) (quoting Albemarle Paper, 422 U.S. at 431). Subsequently in Clady, we endorsed a slightly different test for determining whether a disparate impact defendant has satisfied the burden of showing job relatedness:
 
 
 94
 "This circuit has held that the employer's burden is satisfied by showing "by professionally acceptable methods" that the test is "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated."
 
 
 95
 Clady v. County of Los Angeles, 770 F.2d 1421, 1430 (9th Cir. 1985) (as amended) (quoting Contreras v. City of Los Angeles, 656 F.2d 1267, 1280 (9th Cir. 1981)).
 
 
 96
 Uniform Guidelines and Content Validation: Both the District Court and the parties measure the defendants' test validation procedures against the EEOC's Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines").[20] The Uniform Guidelines "are not legally binding. They have not been promulgated as regulations and do not have the force of law." Clady, 770 F.2d at 1428 (citation omitted). Nevertheless, they are "entitled to great deference." Albemarle Paper, 422 U.S. at 431 (quoting Griggs v. Duke Power Co., 401 U.S. 424, 434 (1971)). We have previously held that "while noncompliance [with the Uniform Guidelines] is not necessarily fatal, it diminishes the probative value of the defendants' validation study." Clady, 770 F.2d at 1430 (internal quotations omitted).
 
 
 97
 The Uniform Guidelines describe and approve three alternative methods of validating employment tests: 1) content validity studies; 2) criterion-related validity studies; and 3) construct validation studies.[21] The District Court evaluated the CBEST validation studies as "content validity " studies, so we turn to the requirements of a content validity.
 
 
 98
 Content validation establishes whether the content of a test closely approximates the tasks to be performed on the job by the applicant.[22] "Evidence of the validity of a test or other selection procedure by a content validation study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated." 29 C.F.R. S 1607.5(B).
 
 2. CBEST Test Validation Studies
 
 99
 a. Job Relatedness
 
 
 100
 Plaintiffs contend that the two pre-litigation studies of the CBEST, the 1982 Wheeler & Elias study and the 1985 Practitioner's Review study, failed to undertake any job analyses to identify work behaviors or job duties and thus could not have determined by "professionally acceptable methods " whether the CBEST is "predictive of or significantly correlated" to any job related duties. Plaintiffs also challenge the skills identified in the 1995 Lundquist study, arguing that Dr. Lundquist erred in her methods for distinguishing skills which are "important" or "critical" from those which are neither. In a detailed and carefully reasoned opinion, the District Court found that all three studies adequately validated the CBEST. As we uphold the District Court's findings for the 1985 Practitioner's Review and the 1995 Lundquist study, we need focus only upon those two studies and we do not need to address the 1982 Wheeler & Elias study.[23]
 
 The 1985 Practitioners' Review
 
 101
 The Practitioners' Review was conducted by Dr. Richard Watkins in 1985. The District Court found that "the Practitioners' Review in 1985 involved the `pooled judgments of informed persons such as . . . job incumbents' about the relevance of the skills tested on the CBEST to the jobs for which it is required, an appropriate form of job analysis under the professional standards of the time." AMAE II , 937 F. Supp. at 1419.
 
 
 102
 The Practitioners' Review polled "234 teachers, administrators, teacher educators, and other school employees," thirty-six percent of whom were members of minority groups. AMAE II, 937 F. Supp. at 1413. "The participants took part in nine review panels, in which they Judged the relevance of both the skills assessed by the CBEST and the test items themselves." Id. The educators were asked to rate the importance of "skills" according to fairly broad categories. For example, the three CBEST reading skills categories are: "literal comprehension," "logical comprehension," and "critical comprehension." In mathematics, the three CBEST skills are "problem solving skills," "applied problem solution," and "concepts and relationships. " Id. Educators were asked to rate how relevant each of the skills tested would be to four jobs: a) elementary school teachers, b) secondary school teachers, c) pupil personnel and librarians, and d) school administrators. Id. These ratings ranged from "not relevant" to "very relevant." Id.
 
 
 103
 The Practitioner's Review thus took steps to learn from teachers and administrators which categories of skills they would identify as relevant to their jobs. Moreover, although such steps might have run a risk of identifying skills at too abstract a level, the categories were defined in detail on the forms which panel members used to rate the categories. For example, the category "Mathematical concepts and relationships" was defined as follows:
 
 
 104
 "Questions in this category test the understanding of basic concepts, such as the meaning of certain terms (area, for example), order among numbers, relationships shown by graphs, elementary probability, and the like. Questions in this category may be from arithmetic, algebra, or elementary geometry."
 
 
 105
 It is true that the Practitioner's Review measured skills at a slightly higher level of abstraction than the Lundquist Study addressed below. Nevertheless, the educators who rated skill categories for job relevance were guided by the specific definitions provided for each category, and were instructed to rate the importance of the skills tested for teaching and nonteaching jobs. These steps are not clearly inadequate under the Craig test, that the employer must "first specify the particular trait or characteristic" and "then determine that that particular trait or characteristic is an important element of work behavior." Craig, 626 F.2d at 662. Thus, the District Court did not clearly err when it found that the Practitioners' Review included "an appropriate form of a job analysis under the professional standards of the time."
 
 1995 Lundquist Study
 
 106
 As we noted above, Plaintiffs do not challenge Dr. Lundquist's methodology for identifying job-related skills. Plaintiffs do, however, challenge Dr. Lundquist's methods for distinguishing skills that are "important" or "critical" from those which are neither.
 
 
 107
 Dr. Lundquist's validation study polled experts and interviewed and observed teachers to develop a list of 59 activities, 39 reading skills, 27 writing skills, and 37 math skills used by teachers. AMAE II, 937 F. Supp. at 1414. Dr. Lundquist then surveyed 1,100 teachers and 230 administrators, asking each to rate the importance of those skills and activities on a four-point scale from 0 ("not applicable") to 3 ("critical"). Id.[24] Skills and activities were retained only if "at least 80 percent of the survey respondents rated the activity or skill as applicable to the job and the mean importance rating was 1.5 or higher on the importance scale." AMAE II, 937 F. Supp. at 1414-15. Applying that standard led to the elimination of several job activities and skills, including 21 of 37 math skills.
 
 
 108
 Plaintiffs focus on the fact that skills were retained with only a mean rating of 1.5 on a scale that designated 1 as "minor" and 2 as "important." Plaintiffs contend that using the rating of 1.5 thereby retained teacher skills and activities that are less important. The plaintiffs argue that, as a result, the Lundquist study violated the command reflected by Craig and by the Uniform Guidelines that only important or critical skills be tested.
 
 
 109
 The District Court disagreed with Plaintiffs, finding that "Dr. Lundquist's decisions reflect manifestly reasonable professional judgments . . . . With respect to the 1.5 mean, as Dr. Lundquist testified at trial, a 1.5 rating rounds up to 2.0. It must be remembered that the mean rating of 1.5 was coupled with an 80 percent endorsement criterion, which is quite stringent." AMAE II, 937 F. Supp. at 1418 n.35.
 
 
 110
 We admit that it is possible to conjure up a scenario that illustrates the plaintiffs' concern. Assume, for example, that 80% of the teachers surveyed agreed that the skill of solving quadratic equations ("skill QE") is "relevant" to the job of teaching, but that 75% of those surveyed rated the importance of skill QE as only minor. If the remaining 25% rated the skill as "critical," the mean importance rating of skill QE would be calculated as 1.5 and thereforeskill QE would be retained despite the fact that three-quarters of the educators considered it of minor importance. However, although this scenario is possible, it is clearly an extreme case and demonstrates that only under anomalous circumstances would an outlying question find its way into the CBEST. Plaintiffs have provided no evidence that any such outlying questions did, in fact, make its way into the CBEST.[25]
 
 
 111
 In sum, although Dr. Lunquist's methodology is not free of any possible error, the mere possibility of error does not demonstrate that the District Court's findings were clearly erroneous. As we have previously observed, validation studies "are by their nature difficult, expensive, time consuming and rarely, if ever, free of error." Cleghorn v. Herrington, 813 F.2d 992, 996 (9th Cir. 1987). Plaintiffs' challenge rests on the theoretical possibility that error could have existed in the writing and reading sections, and no such error has been shown. We conclude that the District Court did not commit clear error in upholding Dr. Lundquist's content validation study despite its possible retention of slightly less "important" skills on the reading or writing portions of the exam.
 
 
 112
 b. Job-Specific Validation
 
 
 113
 Title VII requires that a defendant using a test with a racially disparate adverse impact demonstrate that the test is "job related for the position in question." 42 U.S.C. S 2000e2(k)(1)(A)(i). The Uniform Guidelines provide that"[a]ny validity study should be based upon a review of information about the job for which the selection procedure is to be used." 29 C.F.R. S 1607.14(A).
 
 The 1985 Practitioners' Study
 
 114
 The 1985 study defined the jobs it sought to analyze as 1) elementary school teachers, 2) secondary school teachers, 3) librarians and pupil personnel (counselors and attendance officers), and 4) school administrators. All panel members were asked to Judge the relevance of the CBEST skills by category for those jobs, ranking them from "not relevant" to "very relevant." Although one might argue that the job classifications were too broad, we note that teachers are not infrequently called upon to teach outside of their area of primary expertise. As such, we cannot conclude that the District Court clearly erred in finding the job analysis in the Practitioners' Review to be sufficiently particularized.
 
 1995 Lundquist Study
 
 115
 Dr. Lundquist identified teachers' job activities through several means, including literature reviews, observation of teachers on the job, and interviews with teachers regarding their "job activities, their use of reading, writing, and mathematics skills, and other knowledge, skills and abilities used on the job." AMAE II, 937 F. Supp. at 1414. The Lundquist study began with an initial list of 103 specific reading, writing, and mathematics skills. From that list Lundquist created a survey in which 1,100 educators ranked the relevance and importance of those skills to the job of teaching. According to the District Court, "[a] version of those survey for administrators was also created to determine whether they shared a common set of skill requirements with classroom teachers.... Based on her comparisons of teachers' and administrators' responses, Dr. Lundquist concluded that `all of the skills identified as important for teachers were also important for administrators.' " Id. at 1414-15.
 
 Dr. Lundquist's study reports:
 
 116
 "Basic skill ratings were examined for administrators to determine if the same skill sets applied to both teacher and administrator jobs. Results showed all but one skill item (a math item) retained for teachers also applied to the administrator group. Thus the basic skill requirements identified for teachers were found to be job-related for administrators as well, and the same test specifications may be used to test basic skills for teachers and administrators."
 
 
 117
 Dr. Lundquist classified jobs as either "teacher" or "administrator" and determined that the CBEST, validated for teachers, was also valid for administrative positions. The District Court accepted this validation, concluding that "the CBEST has been adequately validated with respect to non teaching jobs." Id. at 1418. Reviewing the record, we find no clear error in that Conclusion and we therefore uphold it.
 
 
 118
 c. Actual Measurement of Skills
 
 
 119
 Plaintiffs contend that no study has shown that the CBEST actually measures the job skills it purports to measure. "[T]he employer must demonstrate by `professionally acceptable methods' that the selection device is `predictive of or significantly correlated' with the element of work behavior identified [by the job analysis]." Craig, 626 F.2d at 662 (quoting Albemarle Paper Co., 472 U.S. at 431). Plaintiffs claim that the District Court merely accepted the facial validity of the CBEST without any evidence in support when it concluded that the CBEST has been shown to be a valid measure of the basic skills tested.
 
 
 120
 The District Court did not explain the basis for its findings but unambiguously concluded that "the CBEST actually measures . . . basic skills [in reading, writing, and mathematics]" and repeated later that "the skills tested on the CBEST are job-related, and that the CBEST has been shown to be a valid measure of those basic skills." AMAE II, 937 F. Supp. at 1411, 1419.
 
 
 121
 In Contreras, this Court held that "a key requirement of [the] third step [of Craig], a requirement essential to the proof of job relatedness generally, is that the validation method be professionally acceptable." 656 F.2d at 1282. There is evidence in the record from experts in the field to support the District Court's Conclusions. Dr. William A. Mehrens, whose writings on test validity issues include a section titled "Writing and validating the item" reported that:
 
 
 122
 "ETS personnel wrote some of the original items and assisted the test development committees in writing other items. ETS is well known and respected as a developer of standardized tests. They have well trained item writers and an impressive internal set of guidelines they follow with respect to item writing."
 
 
 123
 Asked whether "the CBEST development [was] appropriate with respect to writing and evaluating the items, " Dr. Mehrens testified:
 
 
 124
 "It has been. Many of the items came from an existing ETS pool. Others "were written specifically for CBEST by members of the test development committee in concert with ETS test development specialists." The individuals on the committees
 
 
 125
 "worked with specialists from ETS to further develop and define the content specifications, to review an existing ETS test item pool, to write new test items, and to review the items submitted by fellow committee members. In addition, the committees studied all of the data from the field testing, made recommendations for revisions as they felt necessary, and reviewed all of the final test results."
 
 
 126
 (citations omitted).
 
 
 127
 Even if the test items are expertly developed, they still need to be matched to skills shown to be important to the job via a job analysis. The District Court described the "Curriculum Matching project, in which two ETS employees . . . matched CBEST test specifications to material found in textbooks purportedly used in California public schools." AMAE II, 937 F. Supp. at 1412 n.21. The District Court criticized the study as "unscientific" and "not particularly helpful" but noted that "the study did support the overall Conclusion that the kinds of skills tested on the CBEST can be found in elementary and secondary school textbooks." Id.
 
 
 128
 Because there was some evidence that the CBEST development was appropriate with respect to writing and evaluating the items, the District Court did not clearly err in finding that the test items had been shown by professionally acceptable methods to be predictive of or significantly correlated with elements of work behavior.
 
 
 129
 d. Passing Score Standards
 
 
 130
 The Uniform Guidelines provide: "Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force." 29 C.F.R.S 1607.5(H). We have previously applied that standard in our own cases. See e.g., Craig, 626 F.2d at 6655 (upholding a passing score cutoff as "reasonable and consistent with normal expectations of performance in the . . . program").
 
 
 131
 Courts reviewing cutoff scores on exams with a disparate impact frequently quote from a thorough Discussion that appears in the Second Circuit's decision in Guardians Ass'n of New York City Police Dept., Inc. v. Civil Service Commission of City of New York, 630 F.2d 79, 105 (2d Cir. 1980):
 
 
 132
 "When a cutoff score unrelated to job performance produces disparate racial results, Title VII is violated. Consequently, there should generally be some independent basis for choosing the cutoff. . . .[A] criterion-related study is not necessarily required; the employer might establish a valid cutoff score by using a professional estimate of the requisite ability levels, or, at the very least, by analyzing the test results to locate a logical "break-point" in the distribution of scores."
 
 
 133
 (internal citations omitted).
 
 
 134
 In Guardians, the Second Circuit rejected a cutoff score when the employer "merely chose as many candidates as it needed, and then set the cutoff score so that the remaining candidates would fail." Id. The cutoff was derived solely from the employer's staffing needs, without any reference to the job requirements.
 
 
 135
 Plaintiffs allege that the District Court erred in upholding a twelve-of-sixteen cutoff score on the reading component of the CBEST when an empirical study demonstrates that the proper, job-related passing score on the CBEST writing subtest is nine or ten.
 
 
 136
 The District Court concluded that "the passing scores on the CBEST reflect reasonable judgments about the minimum level of basic skills competence that should be required of teachers." AMAE II, 937 F. Supp. at 1420. The District Court described in detail the process used to develop passing score cutoffs for the original CBEST. The District Court found that then-California Superintendent of Education Bill Honig, who had the ultimate responsibility for setting the score cutoffs, "had before him the results of the Wheeler and Elias study, the results of the field test, and the recommendations of the [Commission] and the [CBEST] Advisory Board." Id. at 1421.
 
 
 137
 Superintendent "Honig testified that he did consider both the results of the Wheeler and Elias study and the [Commission]'s advice when he made his decision, though he ultimately disagreed with both recommendations." Id. at 1422. The data show that almost twenty percent of educators polled either thought a score of eleven-out-of-sixteen was not passing or were not certain. The Superintendent located a logical breaking point based upon professional estimates when he established the bottom passing score at twelve out of sixteen instead, which all readers agreed was a passing score. In the terminology of Guardians, the Superintendent concluded that twelve of sixteen was a "logical break point. " As such, District Court did not clearly err in finding Superintendent Honig's score cutoffs were reasonable.
 
 
 138
 E. The District Court's Appointment of a Technical Advisor
 
 
 139
 Plaintiffs claim that the trial court's rulings were procedurally tainted by the "unreported influence of Dr. Stephen Klein," a RAND Corporation scientist who advised the District Court through ex parte communications with the Judge but was not appointed by the court as an expert witness, was not subject to cross-examination, and did not supply an expert's report.
 
 
 140
 According to the Order Appointing Technical Advisor, the District Court appointed Dr. Klein as a technical advisor, not as an expert witness. Courts have inherent authority to appoint technical advisors, although "such appointments should be the exception and not the rule, and should be reserved for truly extraordinary cases where the introduction of outside skills and expertise, not possess by the Judge, will hasten . . . just adjudication." Reilly v. United States, 863 F.2d 149, 156 (1st Cir. 1988). Recently, in General Electric Co. v. Joiner, Justice Breyer wrote separately to endorse such a practice:
 
 
 141
 "I therefore want specially to note that, as cases presenting significant science-related issues have increased in number . . . Judges have increasingly found in the Rules of Evidence and Civil Procedure ways to help them overcome the inherent difficulty of making determinations about complicated scientific or otherwise technical evidence. Among these techniques are . . . the appointment of special masters and specially trained law clerks."
 
 
 142
 522 U.S. 136, 118 S.Ct. 512, 520, 139 L.Ed.2d 508 (1997) (Breyer, J., concurring).
 
 
 143
 This case involves the highly technical field of psychometrics, and presents problems of unusual complexity beyond the normal questions of fact and law with which Judges routinely grapple. Under the approach identified by Justice Breyer and applied by the First Circuit in Reilley, this case is a fitting case for the use of a technical advisor. The District Court invited the parties to object to Dr. Klein's appointment and plaintiffs did not do so.
 
 
 144
 The District Court advised the parties that, consistent with its usual practice, it expected to put Dr. Klein on the stand towards the end of the trial, ask him his views, and permit the parties to cross-examine him. Had the District Court done so, Dr. Klein would have become an expert witness and his testimony would therefore have become a part of the evidence considered by the Court in its role as the finder of fact. In addition, under Fed. R. Evid. 706(a), the parties could have cross-examined Dr. Klein as a matter of right to test this evidence.
 
 
 145
 However, the District Court did not call Dr. Klein, and there is no evidence that the District Court relied on Dr. Klein's opinions as a source of evidence. To the extent that the District Court relied on Dr. Klein to assist the Court in understanding the evidence submitted by the parties, Dr. Klein remained within the role of a technical advisor as defined in Reilly, similar to the role of a specialized law clerk.[26] Because Rule 706 does not apply to technical advisors, Reilly, 863 F.2d at 155, the District Court no more erred in refusing cross examination of Dr. Klein than it would have erred in refusing cross examination of its law clerks. Likewise, the District Court did not err in not requiring that Dr. Klein furnish an expert's report.
 
 
 146
 F. The District Court's Denial of Costs to the Defendants
 
 
 147
 1. This Court Reviews the Denial of Costs For An Abuse of Discretion
 
 
 148
 Pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure, "costs shall be allowed as a matter of course to the prevailing party unless the court directs otherwise. " F.R.C.P. 54(d)(1). Rule 54 thus creates a presumption in favor of awarding costs to the prevailing party. National Info. Servs., Inc. v. TRW, 51 F.3d 1470, 1471 (9th Cir. 1996). The District Court's denial of costs is reviewed by this Court for an abuse of discretion. United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc., 171 F.3d 1208, 1213 (9th Cir. 1999).
 
 
 149
 2. The District Court Abused Its Discretion When It Entirely Denied Costs to the Defendants
 
 
 150
 Although the decision to award costs resides within the discretion of the district court, a court "generally must award costs unless the prevailing party is guilty of some fault, misconduct, or default worthy of punishment." National Info. Servs., 51 F.3d at 1472.
 
 
 151
 In this case, the District Court explicitly found that the Defendants had not committed any misconduct that would require a denial of costs. Order filed Feb. 12, 1997 at P 2 ("Order"). Nevertheless, the District Court observed that our holding that a court "generally must award costs" implied that there were exceptional cases in which the court might deny costs. Id. (Emphasis added in original Order). In this case, the District Court found that the suit involved an issue of substantial public importance, that the issues were reasonably close and difficult, and that there was some merit to the Plaintiffs' case. Order, PP 3-4, 6-7. The District Court also noted the substantial disparity of resources between the resources of the parties. Order, P 5 (citing National Org. for Woman v. Bank of California, 680 F.2d 1291, 1294 (9th Cir. 1982) and Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 478 (9th Cir. 1983)). On this basis, the District Court concluded that it was within its discretion to completely deny costs to Defendants, and thereupon did so. Order, P 8.
 
 
 152
 We agree with the District Court that our precedent allows a court to consider the limited resources of a Title VII plaintiff when assessing costs. Moore, 708 F.2d at 478; Wrighten v. Metropolitan Hosp., Inc., 726 F.2d 1346, 1358 (9th Cir. 1984). However, these precedents must be read in light of our more recent decision in National Info. Servs. We held in National Info. Servs. that the denial of costs is "by nature a penalty," 51 F.3d at 1472, and that such punitive measures cannot be imposed absent wrong-doing because "a district court cannot punish a party by denying costs unless the party has done something to deserve it." Id. Congress has included nothing in the language of Title VII that would justify the imposition of such a penalty on an exonerated defendant. As a consequence, we conclude that a court may consider the limited resources of a Title VII plaintiff, but may not entirely deny costs to a prevailing defendant as a result.
 
 
 153
 We also conclude that there is no exception to Rule 54(d) that entitles a court to punish a defendant simply because the case involves an issue of national importance. The District Court relied heavily upon a sliver of language contained in two Seventh Circuit cases, which both mentioned "landmark cases of national importance." Delta Airlines, Inc. v. Colbert, 692 F.2d 489, 490 (7th Cir. 1982) and Popeil Bros., Inc. v. Schick Elec., Inc., 516 F.2d 772, 776 (7th Cir. 1975). However, neither case suggested that an exception to Rule 54(d) in fact existed for landmark cases; rather, both cases expressly declined to consider the possibility of such an exception because neither case could have been considered a landmark case of national importance. Delta Airlines, 692 F.2d at 490; Popeil Bros., 516 at. 776. One could not even characterize as dicta the Seventh Circuit's position on this point, because the Seventh Circuit simply has not expressed any opinion. Turning to our own cases and to the text of Rule 54(d), we find nothing that would support such an exception, and we explicitly hold today that there is no such general exception to Rule 54(d) beyond the exception for civil rights plaintiffs.[27]
 
 
 154
 Turning to the District Court's remaining grounds for the denial of costs, we observe that National Info. Servs. specifically rejected the denial of costs on the basis that the plaintiff's position had " `merit.' " National Info. Servs., 51 F.3d at 1471. It also specifically held that " `difficulty' alone does not justify penalizing the prevailing parties." Id. at 1473. These factors should not be considered in the assessment of costs and it was an abuse of discretion for the District Court to consider those factors.
 
 
 155
 Finally, none of the precedents relied upon by the District Court involved the complete denial of costs to a prevailing party,[28] and to the extent that they might suggest a complete denial of costs, such a suggestion would not survive our holding in National Info. Servs. As with the defendants in National Info. Servs., "there is no impropriety on the part of the defendants in this case that would justify denying them their due costs under Rule 54(d)(1)." Id. We therefore remand the case to the District Court for a determination of the proper costs.
 
 III. Conclusion
 
 156
 For the reasons discussed above, we deny Plaintiffs' Appeal, and we grant Defendants' Appeal. The Judgment of the District Court in favor of the Defendants is AFFIRMED, but the case is remanded to the District Court for a determination of the proper costs in light of our Discussion.
 
 
 
 Notes:
 
 
 *
 The Honorable Stephen V. Wilson, United States District Judge for the Central District of California, sitting by designation.
 
 
 [1]
 The introduction and portions of the factual and procedural history were authored by Judge Boochever, and have been incorporated into this opinion with his permission.
 
 
 [2]
 The name of the CTPL was actually changed on January 1, 1983 to the Commission on Teacher Credentialing ("CTC"). AMAE I, 836 F. Supp. at 1538. The CTC remained responsible for administering the test. Id.
 
 
 [3]
 The full provision reads: The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law, and, in addition, the school districts and the other agencies authorized to maintain them. No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System. Cal. Const., art. IX, S 6, P 2.
 
 
 [4]
 Indeed, we believe that it is the only term to which any jurisprudence has attached.
 
 
 [5]
 We note that, despite the statute's suggestion that there is only one "State educational agency," this Court has previously found that different State departments and agencies can together constitute a "State educational agency." Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist., 714 F.2d 946, 951 (9th Cir. 1983); see also Upper Valley Ass'n for Handicapped Citizens v. Mills, 928 F. Supp. 429, 432 (D. Vt. 1996) (holding that Vermont Board of Education and Department of Education "collectively constitute a State educational agency").
 
 
 [6]
 Even at the Constitutional level, the California State Constitution currently reflects the fact that school districts are the primary administrative units for the schools. In 1972, California modified its State Constitution so that, while public schooling continued to be part of the "Public School System," the Legislature was authorized "to permit school districts `to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which the school districts are established.' " Hartzell v. Connell, 35 Cal.3d 899, 916 (1984) (quoting Cal. Const., art. IX, S 14). To the extent that the State Constitution before 1972 might have been understood as requiring centralized control, it is clear that after 1972 the State Constitution permitted the school districts to exist as largely autonomous systems. Moreover, the Court notes that California's Education Code S 35160, enacted in 1976, embodies the intent of article IX, S 14 and allows the school districts to "initiate and carry on any program, activity or[ ] otherwise act in any manner which is not in conflict with . . . any law and which is not in conflict with the purposes for which school districts are established." Cal. Ed. Code S 35160; Choice-In-Education League v. Los Angeles Unified Sch. Dist., 17 Cal. App. 4th 415, 423 (1993).
 
 
 [7]
 We note that we have previously concluded that the California State Board of Education and the California State Department of Education fall within the definition of "State educational agency." Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist., 714 F.2d 946, 951 (9th Cir. 1983).
 
 
 [8]
 We note that Congress selected the term "local educational agency" rather than the larger and more inclusive term "educational agency," which is defined to include both local educational agencies and " `the state board of education or other agency or officer primarily responsible for the state supervision of public elementary and secondary schools.' " Idaho Migrant Council v. Board of Educ., 647 F.2d 69, 71 (9th Cir. 1981) (quoting 20 U.S.C. SS 1720(a), 881(k)).
 
 
 [9]
 Of course, whether or not an entity refers to itself as a "school system" may be a useful piece of evidence in determining whether or not the schools in that entity are closely enough linked to qualify as a "school system" for the purposes of S 2000d-4a(2)(B). However, while such a selfdescription would constitute evidence pointing in one direction, it is not necessarily determinative on the question.
 
 
 [10]
 The Court notes that no House Report was submitted for this bill. The Senate Report is therefore the sole Congressional Report.
 
 
 [11]
 This is not to say that a State may not be the proper defendant under a Title VI suit. The plain language of Title VI demonstrates that a State agency or department may be covered by Title VI. 42 U.S.C.A. S 2000d4a(1)(A-B). To the extent that one would bring suit against the State for violations by such an agency or a department, the State would be the proper defendant. As a result, it is clear that an entity need not itself be a "program or activity" to be named as a defendant for Title VI. AMAE I, 836 F. Supp. at 1541-43. This Conclusion is confirmed within the statute by the structure of subsections 3(A) and (B) of S 2000d-4a. Whereas subsection 3(A) provides for corporation-wide coverage when funding is extended to the corporation as a whole, subsection 3(B) limits the definition of "program or activity" to a particular plant or comparable facility when assistance is extended directly to the plant. 42 U.S.C.A. S 2000d-4a(3)(A) & (B). In the later case, the "program or activity" would be limited to the plant, but the corporation would nevertheless be the proper defendant. For example, were a Ford plant in Dearborn, MI to receive federal funds, Title VI coverage would be limited to the operations of the Dearborn plant and not thereby automatically extend to all of the Ford Motor Company. Nevertheless, any victim of a Title VI violation under the plant-wide "program or activity" would file suit against the Ford Motor Company, which would be a proper defendant despite failing to qualify itself as a "program or activity." Our Conclusion that the State as a whole is not subject to Title VI means only that receipt of federal funds by an agency of the State does not automatically extend Title VI coverage to the entire State government. Of course, the State may nevertheless be sued in the proper circumstances for a violation in a covered program or activity.
 
 
 [12]
 The District Court found that the CTPL (predecessor to the CTC) was created by the Legislature by statute, and that the Governor appoints fifteen of the sixteen voting members of the Commission. AMAE I, 836 F. Supp. at 1538. Moreover, although the CTC is required to notify the Board of Education and the Superintendent of any proposed policies and regulations, the CTC is not subject to the authority of either entity. Id.
 
 
 [13]
 We do note that a parent corporation may be liable under Title VII where it interferes with the employment practices of the subsidiary. Watson, 650 F.2d at 993. However, as we discuss below, we do not consider the CBEST to be the State's proprietary involvement with its "subsidiary" reviewable under Title VII but rather an exercise of its licensing power, reviewable only under the Constitution.
 
 
 [14]
 In evaluating the Texas Exam for Current Administrators and Teachers ("TECAT"), the Fifth Circuit held that a state requirement of the TECAT did not make the State of Texas into an employer and rejected a claim that the State of Texas was potentially subject to Title VII liability for any effect of the exam. Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017, 1020 (5th Cir. 1990). Although the scope of the TECAT is not explicitly discussed in Fields, the teacher's exam upheld in Fields was required only for public school teachers. See State v. Project Principle, Inc., 724 S.W.2d 387, 389-90 (Tex. 1987) (holding that the new requirement that existing Texas public school teachers pass the TECAT constituted a licensing requirement and not a change in the contractual relationship between teachers and school districts).
 
 
 [15]
 The Dissent questions the viability of the proprietary/regulatory distinction, citing J.L. v. Social Sec. Admin. , 971 F.2d 270 (9th Cir. 1992). While we did acknowledge in that case that "[n]ot all actions may be so easily classified," we nevertheless went on to acknowledge that the dichotomy served a limited function. Id. at 272. In this case, we employ the distinction in a very limited setting: Is a particular exam a licensing exam or a regulatory exam? This question can only arise in a certification context where the State is not the employer. Finally, we would note that the distinction between proprietary and regulatory actions is a long established distinction, and we believe that the courts will be able to adequately distinguish between such functions. See generally Reeves, Inc. v. Stake, 447 U.S. 429, 436 (1980) ("The basic distinction drawn in Alexandria Scrap between States as market participants and States as market regulators makes good sense and sound law.").
 
 
 [16]
 We do note, of course, that the CBEST constitutes State action, and could be challenged were the CBEST to violate Plaintiffs' Constitutional rights. There is, however, no allegation that the CBEST violates any Constitutional right.
 
 
 [17]
 The Dissent argues that, having found Title VI and Title VII inapplicable, the remainder of our Discussion on the merits is merely dicta. However, our Discussion is not dicta where, as here, it constitutes an alternative basis for our decision. " `[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum.' " Export Group v. Reef Industries, Inc., 54 F.3d 1466, 1471 (9th Cir. 1995) (per curiam) (quoting Woods v. Interstate Realty Co., 337 U.S. 535, 537 (1949)); see also McDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 346 n.4 (1986).
 
 
 [18]
 If the defendant establishes that the test is job-related, the burden would then shift back to the plaintiff to show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in efficient and trustworthy workmanship." Albemarle Paper, 422 U.S. at 425 (internal quotations omitted). In the appeal before this Court, however, Plaintiffs challenge is limited to the validation, and we do not need to address whether other tests could achieve equivalent desirable results without any disparate impact.
 
 
 [19]
 The District Court's opinion provides a detailed background on the methodology used in each study, AMAE II, 937 F. Supp. 1412-16, and we will not repeat that material here except where necessary to a particular issue in the appeal.
 
 
 [20]
 The Uniform Guidelines were jointly adopted by the EEOC, the Civil Service Commission, the Department of Labor, and the Department of Justice in 1978, and are codified at 29 C.F.R. S 1607. They have remained unchanged since that date.
 
 
 [21]
 The Uniform Guidelines do not preclude the use of other validation methods, but rather provide that "[n]ew strategies for showing the validity of selection procedures will be evaluated as they become accepted by the psychological profession." 29 C.F.R. S 1607.5(A).
 
 
 [22]
 The Uniform Guidelines used the term "content" to describe both the "content of the job," 29 C.F.R. S 1607.14(C)(1), and the "content of the selection procedure." 29 C.F.R. S 1607.5(B).
 
 
 [23]
 We note that the 1982 study raised somewhat different questions than the latter two studies. We explicitly do not reach that study because the fact that the latter two studies survive this appeal makes the 1982 study redundant and relieves us of the additional burden of evaluating the District Court's findings on that study.
 
 
 [24]
 The other two options were 1 ("minor") and 2 ("important").
 
 
 [25]
 In addition, even if Dr. Lundquist's results were called into question by the initial retention of some skills that were slightly less "important," the mathematics portion of her content validity study was saved by a subsequent step she took. When faced with the prospect that 21 of the 37 math skills would be eliminated, the Commission engaged Dr. Lundquist to conduct a focused content validity study on the math segment. Lundquist employed a panel of twenty teacher educators who conducted a fresh review of the 37 math skills. For a skill to be retained, 80 percent of the panel had to rate it as "applicable and required at entry, and the skill had to have average and future importance ratings equal to or greater than two (out of a three-point scale, one being `minor,' and three being `critical')." AMAE II, 937 F. Supp. at 1416. Thus, on the math section, only skills rated "important" on average were retained.
 
 
 [26]
 Indeed, both Reilly and the District Court explicitly liken the role of a technical advisor to that of a law clerk.
 
 
 [27]
 Quite recently, we held that a district court abused its discretion by awarding especially high costs without considering that such high costs would render the civil rights plaintiff indigent. Stanley v. University of Southern California, 178 F.3d 1069(9th Cir.1999). We therefore remanded the case so that the district court could consider the possibility of indigence and the effects of imposing "such high costs" on civil rights litigants. Id. at * 9.
 
 
 [28]
 In the only cited appellate case in which costs were completely denied, Pursche v. Atlas Scraper & Eng'g Co., 300 F.2d 467, 489 (9th Cir. 1961), we affirmed a finding that neither party would be considered the "prevailing party" where one claim of the plaintiff's patent was declared invalid. Id. In the current case, the District Court appears to have found that Defendants were the prevailing party.
 
 
 BOOCHEVER, Circuit Judge, Dissenting:
 
 157
 The majority opinion holds that the CBest examination is not subject to Title VII because the CBest is a licensing exam. Because I believe that the majority's holding rests on the mistaken Conclusion of law that Title VII does not apply to the CBest simply because it is a licensing exam, I respectfully Dissent from that portion of the opinion which holds that the CBest is not subject to Title VII.[1] Because the majority holds that neither Title VI nor Title VII applies, I see no reason for dictum concerning the merits of the contention that the CBest violated Title VI and Title VII.
 
 I.
 
 158
 The majority characterizes the "critical issue " in this case as "whether the State is exercising its police powers or proprietary powers." Majority Opinion at 7549. If the CBest is an exercise of the State's police powers, the majority states, then the CBest would be a licensing exam and therefore exempt from Title VII liability. See id. at 7550. Ignoring for the moment the wisdom of relying on a standard as uncertain as the "police/proprietary power" standard offered by the majority, I believe that framing the issue in these terms is incorrect as a matter of law.
 
 
 159
 Title VII provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin. " 42 U.S.C. S 2000e-2(a). Title VII governs the relationship between employers and employees; it does not speak to any exceptions for governmental licensing activities or exercises of the State's police power. Under Title VII, the only issue we need examine is whether an employer has "fail[ed ] or refuse[d] to hire any individual because of such individual's race, color, religion, sex, or national origin." Id. Thus, if the State as employer administers a test to its potential employees as a condition of employment, the exam would be subject to Title VII notwithstanding its being called a licensing exam or characterized as an exercise of the State's police power.[2]
 
 
 160
 I would agree with the majority that in most cases, courts have found that Title VII did not apply to a governmental licensing agency. See George v. New Jersey Bd. of Veterinary Med. Exam'rs., 794 F.2d 113, 114 (3d Cir. 1986); Haddock v. Bd. of Dental Exam'rs., 777 F.2d 462, 463-64 (9th Cir. 1985); Woodard v. Virginia Bd. of Bar Exam'rs. , 598 F.2d 1345, 1346 (4th Cir. 1979) (per curiam); but see Puntolillo v. New Hampshire Racing Comm'n, 375 F. Supp. 1089, 1092 (D.N.H. 1974) (holding that a state agency that licensed race horse drivers was an employer of the drivers where the agency allegedly interfered with their employment by race track owners). The result of the George, Haddock and Woodard cases should not be surprising, however, because in those cases, there was no employment relationship between the licensing entity and employee, and the courts concluded that the licensing entity was not an applicable "employer" under Title VII. In other words, the licensing entity was not subject to Title VII for its activities because it lacked an employment relationship with the employees, not because their activities could be characterized as licensing activities.
 
 
 161
 Rather than focusing on the employment relationship, the majority's approach attempts to determine whether the State's action is an exercise of its police or proprietary powers. Even assuming that such a framework is workable, and I do not believe that it is, see, e.g., J.L. v. Soc. Sec. Admin., 971 F.2d 260, 270 (9th Cir. 1992) (stating that such a framework "would require courts to make unfamiliar and potentially unworkable threshold characterizations of agency actions as either proprietary or regulatory"), framing the issue in these terms begs the question. Further, the majority's two-factored test to distinguish a State's police and proprietary powers is of little help in this case.
 
 
 162
 In any event, because licensing exams are not exempt from Title VII scrutiny, whether we determine that the CBest is an exercise of the State's police power and, according to the majority opinion, "therefore a valid licensing exam," is irrelevant. See Majority Opinion at 7550. Under Title VII, our focus is whether an employer has "fail[ed] or refuse[d] to hire any individual . . . because of such individual's race, color, religion, sex or national origin." It makes no difference whether the failure or refusal to hire is based on the exercise of police or proprietary powers.
 
 II.
 
 163
 Still, the issue remains in this case whether the State may properly be characterized as the employer of the public school teachers. While the employment relationships between the State and public school teachers are not direct ones, they are nevertheless strong, and I believe warrant treating the State as the teachers' employer under Title VII. The majority concludes that California public school teachers are not the State's employees, and that the CBest is not an employment exam, because public teachers do not have a traditional employment relationship with the State. Such a Conclusion, however, does not end the inquiry under Title VII. As the majority rightfully concedes, a direct employment relationship is not a prerequisite for Title VII liability. See Majority Opinion at 7548 n.13.
 
 
 164
 This Court has held that while "there must be some connection with an employment relationship for Title VII protections to apply . . . [t]he connection with employment need not necessarily be direct." Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 (9th Cir. 1980) (footnotes omitted); see also Baker v. McNeil Island Corrections Ctr., 859 F.2d 124, 127 (9th Cir. 1988). Title VII " `does not use the term "employee." The phrase is, rather, the "person aggrieved;" and that term can certainly be taken as comprehending individuals who do not stand in a direct employment relationship with an employer.' " Gomez v. Alexian Bros. Hosp. of San Jose, 698 F.2d 1019, 1021 (9th Cir. 1983) (per curiam) (quoting Sibley, 488 F.2d at 1341). Such a reading is also consistent with liberally interpreting the definition of "employer" in order to effectuate the remedial and public policy goals of Title VII. See Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350, 1359 (11th Cir. 1994); Spencer v. General Elec. Co., 894 F.2d 651, 657 (4th Cir. 1990), abrogated on other grounds, Farrar v. Hobby, 506 U.S. 103 (1992); Owens v. Rush, 636 F.2d 283, 287 (10th Cir. 1980); Quijano v. Univ. Fed. Credit Union, 617 F.2d 129, 131 (5th Cir. 1980); Baker v. Stuart Broadcasting Co., 560 F.2d 389, 391 (8th Cir. 1977); Sibley Mem. Hosp. v. Wilson, 488 F.2d 1338, 1340-41 (D.C. Cir. 1973).
 
 
 165
 I agree with the majority that the relationship between the State and local school districts is analogous to the relationship between a corporate parent and its wholly owned subsidiary. I disagree, however, with the majority's Conclusion that a parent corporation would not be subject to Title VII under the circumstances involved. This court has previously held that "[i]n the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary." Watson v. Gulf and West. Indus., 650 F.2d 990, 993 (9th Cir. 1980) (emphasis added). In Watson, the plaintiff contended that both the parent corporation, Gulf, and its wholly owned subsidiary, Paramount, were liable for Paramount's Title VII violations. Id. Because there were no "special circumstances" present, the Watson court upheld the district court's grant of summary judgment to Gulf. In explaining what might constitute "special circumstances," however, the Watson court stated: "[i]f there was any evidence that Gulf . . . participated in or influenced the employment policies of Paramount, . . . then we would be presented with a very different case." Id. (emphasis added).
 
 
 166
 Although the majority recognized that a parent corporation might be liable under Title VII given the presence of such special circumstances, the majority expressly declined to consider whether the State's heavy involvement in local school district's operations were sufficient to hold the State liable under Title VII. See Majority at 7548 n.13. The majority avoided this issue by concluding that the CBest is a licensing exam, and that Title VII does not apply to governmental licensing activities. As demonstrated in the previous section, however, that Conclusion is mistaken, and we must therefore determine whether the State possesses an employment relationship with public school teachers. Given the close regulatory control exercised by the State over all aspects of the operation of local school districts, including personnel policies, I conclude that under Title VII the State is an employer of public school teachers.[3]
 
 
 167
 School districts are agents of the State for the local operation of the common school system, see Hall v. City of Taft, 302 P.2d 574, 577 (Cal. 1956), and under the California Constitution, the duty of educating the state's children falls squarely upon the State. See Cal. Const. Art. I, S 1. California courts have long recognized that "public schools . . . are a matter of statewide rather than local or municipal concern; their establishment, regulation and operation are covered by the Constitution and the state Legislature is given comprehensive powers in relation thereto." Hall, 302 P.2d at 576; see also San Francisco Unified Sch. Dist. v. Johnson, 479 P.2d 669, 677 (Cal. 1971); Johnson v. San Diego Unified Sch. Dist., 266 Cal. Rptr. 187, 191 (Ct. App. 1990)."The Constitution has always vested `plenary' power over education not in the districts, but in the State, through its Legislature, which may create, dissolve, combine, modify, and regulate local districts at pleasure." Butt v. State of California, 842 P.2d 1240, 1254 (Cal. 1992). "The local school district system of administration, although "recognized by the Constitution and deeply rooted in tradition, is not a constitutional mandate, but a legislative choice," id. (citing Cal. Const., art. IX, SS 6-1/2, 14), and it is clear that "[t]he system of public schools . . . is `one system . . . applicable to all the common schools. .. .' " Butt, 842 P.2d at 1248 (emphasis omitted) (quoting Kennedy v. Miller, 32 P. 558, 559 (Cal. 1893)). Further,"[u]nlike most states, California school districts have budgets that are controlled and funded by the state government rather than the local districts." See Belanger v. Madera Unified Sch. Dist., 963 F.2d 248, 251 (9th Cir. 1992). This court has held that given this relationship, school districts enjoy the State's immunity under the Eleventh Amendment. Id. at 254.
 
 
 168
 Local school districts are bound by a multitude of State constitutional and statutory mandates. For example, the California Constitution
 
 
 169
 "creates State and county educational offices, including a Superintendent of Public Instruction and a State Board of Education. It authorizes the formation of local school districts, requires that all public elementary and secondary schools be administered within the Public School System, establishes a State School Fund, reserves a minimum portion of State revenues for allocation to the Fund, guarantees minimum allocations from the Fund for each public school, specifies minimum salaries for public school teachers, authorizes the State Board of Education to approve public school textbooks, and permits the Legislature to grant local districts such authority over their affairs as does not conflict with the laws and purposes for which school districts are established."
 
 
 170
 Butt, 842 P.2d at 1248 (citations and quotations omitted). In addition, State statutes govern
 
 
 171
 such matters as county and district organization, elections, and governance; educational programs, instructional materials, and proficiency testing; sex discrimination and affirmative action; admission standards; compulsory attendance; school facilities; rights and responsibilities of students and parents; holidays; school health, safety, and nutrition; teacher credentialing and certification; rights and duties of public school employees; and the pension system for public school teachers.
 
 
 172
 Id. at 1254 (citations omitted). Finally, this statutory scheme is supported by "voluminous regulations administered by the State's Department of Education and the [California Superintendent of Public Instruction]." Id. It is clear that even though local school districts are operated by officials who are locally elected and appointed, they are effectively extensions of the State in providing a constitutionally mandated public education to California children. The complex legal and functional relationship between the State and local school districts constitutes sufficient "special circumstances" to warrant holding the State liable as an employer of the public school teachers for the CBest, even without the direct employment relationship otherwise required by the majority.[4]
 
 
 173
 In any event, it is clear that even without a direct employment relationship with the teachers, the State would still be subject to Title VII as a covered employer if it discriminatorily interferes with the employment opportunities of public teachers with local school districts. See Gomez , 698 F.2d at 1021; Sibley, 488 F.2d at 1341. The majority also declined to discuss this issue, again because the majority concluded that licensing exams are not subject to Title VII. See Majority Opinion at 1072.
 
 
 174
 A sufficient relationship arises under Title VII where an entity, usually a labor union or employment agency, is in a position to interfere with an applicant's employment opportunities with a third party, and does so. Sibley , 488 F.2d at 1341. In this case, the State regulates the credentials necessary for public school employment. An applicant who does not adhere to the State's requirements is free to teach in private schools, but not in public schools. As Gomez stated,
 
 
 175
 "it would contravene Congress's intent in Title VII "[t]o permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service. . . ."
 
 
 176
 Gomez, 698 F.2d at 1021 (quoting Sibley , 488 F.2d at 1341). These circumstances certainly exist in the instant case. Only the state Legislature possesses the constitutional authority to regulate public school teacher hiring on a statewide level, such as by imposing a credentialing requirement like the CBest, but under the majority opinion, the State is not subject to Title VII because it is not a direct employer. On the other hand, local school districts, which are the direct employers, are not subject to Title VII because it is the State and CTC that require and administer the CBest. Given these circumstances, as a practical matter, the majority's reading of Title VII leaves minority public school teachers without any of the protections afforded by Title VII to challenge a state-imposed employment practice such as the CBest. "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike," Dothard v. Rawlinson, 433 U.S. 321, 331-32 n.14 (1977), and surely did not intend to allow states so easily to circumvent Title VII's mandate. Thus, I would hold the State subject to Title VII as a covered employer if it discriminatorily inter feres with the employment opportunities of public teachers with local school districts.[5]
 
 
 177
 In sum, because I believe that the CBest examination is subject to the provisions of Title VII, I would reach the merits of the plaintiffs' Title VII claims and determine whether the CBest was properly validated. Because the majority concludes that Title VII does not apply, I do not express any opinion whether the CBest, as validated by the three studies, violated Title VII.
 
 III
 
 178
 "The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." Griggs v. Duke Power Co., 401 U.S. 424, 429 (1971). I do not believe that congressional intent is served by relying on a constrained reading of Title VII to avoid the application of that statute to statewide hiring requirements for all public school teachers.
 
 
 179
 As a result of today's decision, California is no longer bound to follow Title VII's mandate when imposing its statewide hiring requirements for public school teachers, however invidious, discriminatory, or harmful those requirements may be. In reaching its decision, the majority ignores the political realities of public education in California and instead relies on the non-dispositive observation that the relationship between the State and public school teachers is not a traditional one. Because I believe that the majority has diminished the protections of Title VII for public school teachers beyond what Congress intended, I respectfully dissent.
 
 IV.
 
 180
 The district court stated the following as its reasons for denying all costs: the suit involved an issue of substantial public importance; the issues were reasonably close and difficult; that there was some merit to the plaintiffs' case; and there was a substantial disparity of resources between the parties. The majority holds that these reasons may not themselves justify the denial of all costs to the prevailing parties. When, however, there is the added circumstance that awarding such high costs against a civil rights plaintiff may well have a "chilling effect . . . on future civil rights litigants," Stanley v. Univ. of Southern California, slip op. at 5321, 1999 WL 346615 at *9 (9th Cir. June 2, 1999), I believe that it is within the district court's discretion to deny all or a portion of the huge costs assessed in this case.
 
 
 181
 I start with the acknowledged fact that the CBest resulted in the failure of a disproportionate number of minorities as compared to Caucasians. To challenge the State of California, with all of its resources, may well be daunting -- a David facing Goliath -- if in addition to the attorneys' fees and costs incurred in bringing suit in such a complex matter, the plaintiffs may be required to pay the defendants' costs, which in this case amount to $216,433.67.
 
 
 182
 The case primarily relied upon by the majority is not a civil rights case, but litigation between private corporations, where National Information Services, Inc., Credit Data of Illinois, Inc., Informative Research, Inc., and CDB Infotek all sued TRW, Inc. and Credit Bureau Reports, Inc. for alleged antitrust violations. See Nat'l Info. Services, Inc. v. TRW, Inc., 51 F.3d 1470 (9th Cir. 1995) (as amended). Under the circum stances there involved, where the litigation is between corporate entities, the failure to award costs to the prevailing party properly was considered an unjustified penalty. The appeal before us more closely involves the civil rights considerations set forth in Stanley.
 
 
 183
 While I concur in the majority's decision to remand for a determination of the proper costs, I assume that the majority agrees that in making its determination of the proper amount of costs, the district court in its discretion may consider whether there is a disparity of resources between the parties; the fact that this is civil rights litigation; the plaintiffs' partial success in securing modification of the CBest; the possibility that the cost award would render some or all of the plaintiffs indigent; the possibility that the cost award could chill future civil rights litigation, and any other appropriate factors.
 
 
 184
 Unlike the majority, however, I would allow the district court, in exercising its broad discretion, to award zero costs if the balance of factors so warrant. This result is supported by Stanley. In Stanley, this court found that the award of costs by the district court was an abuse of discretion because the district court had failed to consider all of the proper factors, namely the possibility that the cost award could render some or all of the plaintiffs indigent, or the possibility that the cost award could chill future civil rights litigation, and thus remanded the issue to the district court for reconsideration in light of those factors. If, on remand in this case, the district court properly considers the factors discussed above and then determines that given those factors, the appropriate cost award is zero, then under Stanley, I believe the district court would be acting within its discretion in awarding zero costs.
 
 
 185
 Federal Rule of Civil Procedure 54(d)(1) provides in part that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; . . ." (emphasis added). The district court's power in an appropriate case to "otherwise direct" is not limited. Yet, the majority engages in engrafting on the rule a requirement that "in no event may the court direct that no costs be awarded." While in some cases it would certainly be an abuse of discretion for a court to direct that no costs be awarded a prevailing party, we should not attempt to restrict the discretion granted the court so as to eliminate that possibility in all cases. Rule 54(d)(1) itself is broad enough to allow district court Judges to deny all or a portion of the costs to the prevailing parties, and we should only interfere when they abuse their discretion. Because I disagree that in a civil rights case, a district court necessarily abuses its discretion when it denies all costs to a prevailing party, I respectfully Dissent from that part of the majority's holding.
 
 
 
 Notes:
 
 
 [1]
 I also do not concur in the majority's Conclusion that Title VI is inapplicable to the CBest. This court has previously held that Title VI disparate impact analysis closely tracks Title VII disparate impact analysis. Larry P. v. Riles, 793 F.2d 969, 982-83 & fns. 9-10 (9th Cir. 1986) (as amended) (placing the burden on a Title VI defendant to prove that an exam with a disparate impact on African-American children was "required by educational necessity"); cf. Smith v. Barton, 914 F.2d 1330, 1336 (9th Cir. 1990) (stating that courts look to Title VII to determine appropriate rules under Title VI). Thus, because Title VI disparate impact analysis would be the same as that of Title VII, and I conclude that Title VII applies to the CBest as administered by the State and Commission on Teacher Credentialing (CTC), I do not find it necessary to address the issue whether Title VI is also applicable.
 
 
 [2]
 The State is subject to Title VII even though it is a state agency, the CTC, that actually administers the CBest. Title VII does not limit its application to direct employers, but includes "any agent" of that employer. See 42 U.S.C. S 2000e-2(a); Morgan v. Safeway Stores, Inc., 884 F.2d 1211, 1214 (9th Cir. 1989).
 
 
 [3]
 The majority erroneously relies on Gonzales v. State of California, 29 Cal. App. 3d 585 (1972), for the proposition that "California law establishes that [public] teachers are not State employees." Majority Opinion at 7551; see also id. at 7548. Gonzales is inapplicable, however, because it merely holds that the general theory of respondeat superior does not ren der the State liable for the torts of local school districts or their employees. See id. at 590-92; Butt v. State of California, 842 P.2d 1240, 1248 (Cal. 1992) (citing Gonzales). Gonzales thus does not address whether the State may be subject to Title VII for its actions in carrying out its broad constitutional duty to educate the state's children. See Butt, 842 P.2d at 1248 (stating that while "[school] districts are separate political entities for some purposes . . . the existence of th[e] local-district system has not prevented recognition that the State itself has broad responsibility to ensure basic educational equality under the California Constitution.").
 
 
 [4]
 In reaching its holding that the State is not the employer of the public teachers, the majority relies heavily on Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017, 1020 (5th Cir. 1990) (per curiam). In Fields, the Fifth Circuit held that the State of Texas was not subject to Title VII for a teacher credentialing exam similar to the CBest because the State was not the employer of the public teachers. Fields is distinguishable in several respects. First, because the issue was not properly raised, the court expressly declined to consider whether Texas's close relationship with the local school districts might change their holding. See id. at 1019 fns. 2&3. Second, the analysis in Fields focused on whether Texas exercised any right of control over the teachers. See id. at 1019-20. This analysis may be relevant to whether Texas maintained a direct employment relationship with the public school teachers, but it is inapposite to the determination whether the State could be an employer under Title VII as a result of its close regulation of public schools.
 
 
 [5]
 Numerous courts relying on Sibley have also found public actors to be the relevant employer under Title VII for interfering with the employment opportunities of covered employees. See United States v. City of Yonkers, 592 F. Supp. 570, 589-92 (S.D.N.Y. 1984); Rivas v. State Bd. for Community Colleges, 517 F. Supp. 467, 470 (D. Colo. 1981); Vanguard Justice Soc'y, Inc. v. Hughes, 471 F. Supp. 670, 696-97 (D. Md. 1979); Curran v. Portland Superintending Sch. Comm., 435 F. Supp. 1063, 1073 (D. Me. 1977); Puntolillo, 375 F. Supp. at 1091-92.